Filed 9/21/15  P. v. Miller CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>CHRISTOPHER JOSEPH MILLER,<br><br>        Defendant and Appellant. | A139503<br><br>(Contra Costa County<br>Super. Ct. No. 5-120438-7) |

Defendant Christopher Joseph Miller appeals a judgment convicting him of molesting a child under the age of 14, possession of child pornography and failure to register as a sex offender. He argues the prosecutor repeatedly engaged in prejudicial misconduct, that his counsel provided ineffective assistance and that the trial court erred in admitting unduly prejudicial evidence. He also asserts the court abused its discretion in ordering him to pay $1 million in restitution for the victim's noneconomic losses. We shall affirm.

**Factual and Procedural History**

Defendant was charged by amended information with 29 counts of lewd and lascivious conduct with Doe 1, a child under the age of 14 (Pen. Code,[1] § 288, subd. (a)); counts 1 though 29), possession of pornography with a prior conviction (§ 311.11, subd. (b); count 30), failure to register as a sex offender upon release from incarceration (§ 290.015, subd. (a); count 31), failure to register as a sex offender at each residence (§ 290.010; count 32), failure to complete annual sex offender registration (§ 290.012,

---

[1] All statutory references are to the Penal Code unless otherwise noted.

subd. (a); count 33), and failure to register as a sex offender within five days of change of address (§ 290, subd. (b); count 34). The information alleged in connection with counts 1 through 29 that defendant had substantial sexual contact with the minor (§ 1203.066, subd. (a)). The information also alleged defendant served two separate prior prison terms (§ 667.5, subd. (b)).

The following evidence was presented at trial:

Defendant admitted that he was a pedophile and that he had been sexually and romantically attracted to young boys all his life. He was first convicted of possession of child pornography in 1997 and, as a result, was required to register as a sexual offender. Defendant went to prison in 2007 after being convicted of additional child pornography charges. Defendant did not register within five days of his release from prison in December 2008, despite being notified of his obligation to do so.

In early 2009, Vickie lived with her two sons Doe 1, age 12, and Doe 2, age eight. The boys were friends with nine-year-old Doe 3 who lived in the neighborhood. In February 2009, defendant moved into an apartment with Doe 3 and Doe 3's father. Vickie and defendant became friends through the children and in late May or early June 2009, defendant moved into Vickie's apartment with her two sons.

Defendant had his own bedroom and Doe 1 and Doe 2 shared a separate bedroom. Soon after defendant moved in, Doe 1 started to spend the nights in defendant's bedroom. At first he slept on the couch in defendant's bedroom, but he later moved to the top bunk. Eventually, he moved down to the bottom bunk, and he and defendant slept in the same bed.

On December 1, 2009, defendant was arrested for failing to register as a sex offender.

The next day, on December 2, Doe 1 gave a statement to a forensic interviewer. A recording of Doe 1's statement was played for the jury. Doe 1 told the interviewer that when he spent the night at Doe 3's apartment, defendant would sleep in the same bed with Doe 1, and defendant asked him to take off his clothes. Defendant would "give [Doe 1] oral sex." Defendant asked Doe 1 to kiss him on his face. Defendant touched the

2

youth all over his body. He told Doe 1 not to talk to anybody about what they were doing. When defendant moved into Doe 1's apartment, Doe 1 began to sleep in defendant's bed. The same sexual activity continued two or three times a week, including oral sex.

At trial, Doe 1 confirmed that he and defendant began sleeping in the same bed when defendant was living at Doe 3's apartment. From the first night, defendant began touching the boy's genitals under his clothing. At first, defendant remained clothed, but he soon started to sleep naked. Defendant put his mouth on Doe 1's genitals. Doe 1 testified, "After the first time it just became like that every night." Once or twice, defendant warned Doe 1 not to tell his mother about what was happening.

When defendant moved into Doe 1's residence, Doe 1 began to spend the night in defendant's room. Initially it was a rare occasion, but it "became a habit to where I would just sleep there every night without question." Doe 1 explained that he "usually" slept in his clothing "until it came to the touching and stuff." Defendant touched Doe 1's body "hand to genital [and] mouth to genital." The same type of sexual activity occurred three to four times a week. On one occasion, defendant put his finger inside Doe 1's anus and moved it in and out. Doe 1 explained that he would ask defendant to rub his feet, and defendant "would start massaging my feet and then work his way up my legs to my genitals."

Defendant "would constantly" say that he loved Doe 1, and Doe 1 believed him. Although Doe 1 thought the relationship was strange at first, it "kind of became normal" to hear that defendant loved him. Doe 1 was upset when defendant was arrested. He explained, "[A]t the time I didn't have a strong relationship with my mom, so I thought the only person who actually cared had left."

On cross-examination, Doe 1 was questioned about a letter he wrote following defendant's arrest in which he said that defendant never hurt or molested him.[2] He

---

[2] The letter, which was admitted into evidence, reads, "To Whom It May Concern: [¶] Chris was and still is a great guy. He cooked for us, helped me with my school work and helped me to behave better with my mom. He was a good friend and a greater dad. We were like a real family together. [¶] During the police interview, I was told lies about

3

explained that his mother asked him to write the letter saying that defendant had not molested him because "it was by my own will." At the time he wrote the letter, he misunderstood what "molestation" meant. Later, he explained that at the time he wrote the letter he thought that molestation was touching someone without their approval, "So because I approved or let him, I thought that it wasn't molestation." He meant that defendant did not do anything forcibly.

Defendant claimed that he never touched Doe 1 in a sexual manner. He acknowledged that he allowed Doe 1 to sleep next to him in his bed, but under a separate blanket. He denied touching Doe 1 during the night with his hands but admitted their bodies bumped up against each other. When asked if he "received lustful gratification" from sleeping next to Doe 1, defendant responded, "I received a warm, wonderful, pleasurable feeling sleeping next to a boy that I was attracted to. [¶] Lustful gratification to me means having a orgasm or doing sexual activity. I hate to split hairs with this, but it was pleasurable to sleep next to him." Defendant admitted that there was "definitely a romantic gratification" which contained "an element of lustful gratification as well." Defendant also acknowledged that Doe 1 would sleep naked, "[I]t was not entirely uncommon for him [Doe 1] to take his boxer shorts off . . . . [H]e would pull off his boxer shorts and giggle and throw them across the room and sleep naked. And I didn't ask him to do it, but, again, I didn't stop him. . . . [¶] . . . I definitely found it sexually pleasurable that he was next to me naked."

Following defendant's arrest in December 2009, law enforcement officers located a laptop computer in defendant's bedroom. On the computer, officers found evidence that defendant engaged in numerous online chat sessions while living with Doe 1. During the chats, defendant said that he lived with a 12-year-old "young friend" and that they had

---

Chris. This made me go on a blind rage. I regret saying that "I feel safe now that Chris is gone." I have always felt safe at all times around Chris. Another statement I regret is stating, "I was afraid of what Chris would do to me." I said that only because I was upset from the lies the police told me about him. Chris never molested me or hurt me in any way possible."

sex around five times per week. Defendant claimed that he often boasted over the Internet, but that his boasts were merely "inventions" which he made up because the imagery excited him.

Officers also found in defendant's computer pornographic videos and photos of an individual referred to as Doe 5. Doe 5's father testified that defendant met Doe 5 in March 2006 when Doe 5 was nearly 12 years old. Defendant's friendship with Doe 5 lasted only three months. The friendship ended when Doe 5's father did an Internet search and found that defendant had a criminal record. The video found on defendant's computer showed Doe 5 masturbating. Defendant claimed to have received the video from a third party, but admitted that he put Doe 5's name and age on the videos and distributed them to other pedophiles on the Internet. Defendant acknowledged that this was "a terrible thing" to do, but explained that he was very angry with Doe 5 at the time. He claimed that his anger stemmed from "bizarre" sexual abuse allegations that Doe 5 had made against him. Defendant admitted that he was attracted to Doe 5 and that he had slept in the same bed with him.

Finally, defendant was cross-examined about his relationship with Doe 4. Defendant acknowledged that when he was 21 years old and serving as a youth worker at a church, he formed a close relationship with 13-year-old Doe 4. He became close to Doe 4's mother and spent nights at their home. He kept a journal about his activities with the boy. Defendant explained, "There is no mention [in the journals] of literal sex. I was really kind of in denial at the time, but there's a lot of talking about loving being near him and touching him and massaging him and that kind of thing." Defendant denied having lustful feelings for Doe 4, but acknowledged he was "definitely feeling the swirl of really inten[se] emotions that [he] didn't know what to do with." Defendant acknowledged touching the boy, but claimed he did not get sexual pleasure from doing so.

The jury convicted defendant of all counts and found the substantial sexual contact allegations true. The court subsequently found true the two prior prison term enhancements. Defendant was sentenced to a prison term of 69 years four months, consisting of the eight-year upper term on count 1, 28 consecutive two-year terms on

counts 2 through 29, a consecutive term of one year four months on count 30, consecutive eight-month terms on counts 31, 32, and 34, and two consecutive one-year terms for the prior prison term enhancements.

Defendant filed a timely notice of appeal.

**Discussion**

1.      Prosecutorial Misconduct: Misstatement of the Law

Defendant contends his counsel provided ineffective assistance, in violation of the Sixth Amendment to the United States Constitution, by failing to object to the prosecutor's alleged misconduct. In a challenge based on alleged ineffective assistance of counsel, defendant must demonstrate: (1) that that conduct of the attorney fell below an objective standard of reasonableness; and (2) that but for counsel's alleged errors, it is reasonably probable that a determination more favorable to the defendant would have resulted. (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1007.) As discussed below, because we conclude the prosecutor did not commit misconduct, counsel was not ineffective for failing to object and defendant suffered no prejudice.

Defendant contends the prosecutor committed misconduct by incorrectly defining section 288 before the jury. It is misconduct for the prosecutor to misstate the law during argument (*People v. Huggins* (2006) 38 Cal.4th 175, 253, fn. 21; *People v. Otero* (2012) 210 Cal.App.4th 865, 870), especially when the misstatement of law attempts "to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements" (*People v. Marshall* (1996) 13 Cal.4th 799, 831). " ' "When a claim of misconduct is based on the prosecutor's comments before the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " ' " (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1275.)

Section 288, subdivision (a), provides that "any person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of

6

a felony . . . ." It is settled that the touching itself need not take any particular form provided that it is done with sexual intent. (*People v. Shockley* (2013) 58 Cal.4th 400, 404.) " '*Any* touching of a child under the age of 14 violates this section, even if the touching is outwardly innocuous and inoffensive, if it is accompanied by the *intent* to arouse or gratify the sexual desires of either the perpetrator or the victim.' "(*People v. Lopez* (1998) 19 Cal.4th 282, 289.) Defendant contends the following questions and argument by the prosecutor improperly excluded the element of sexual intent from the definition of section 288.

On cross-examination defendant was asked whether he had ever touched a minor in a manner which he found sexually arousing and defendant indicated that he refrained from conduct which was overtly sexual. He explained, "I have done everything in my lifetime to come very close to not going over the border. I've done everything in my ability to not have a sexual experience with a child, oral sex, masturbation, touching of the penis, anything like that. I have never done that in my lifetime." Then the prosecutor asked, "I'm going to take you back to the beginning of your testimony. *You said that when you touched children at [the home of Doe 3's father], whether it be their arms, their legs or anywhere else, you would have lustful feelings. That is a violation of Penal Code Section 288a*. [¶] So I'm going to ask you again, how many children have you touched anywhere on their body that you did to gain gratification, lustfully or to be aroused or in some way gain some sort of sexual pleasure? You do not have to get an erection, you do not have to ejaculate, but just to gratify yourself lustfully." Defendant responded, "It's an impossible question to give you a straight number to, but I will say this: I have had a close friendship with four different boys in my adult lifetime."

Contrary to defendant's argument, the prosecutor's cross-examination quoted above, including the italicized portion emphasized by defendant, did not suggest that merely touching a minor without sexual intent constituted lewd and lascivious conduct. Rather, the prosecutor's questions were intended to elicit acknowledgement that defendant had touched minors in a manner that he may not have considered overtly

"sexual" but nonetheless were for the purpose of his own sexual gratification. There was no fault in the prosecutor's questions.

Likewise, there was no misconduct in the prosecutor's closing argument. The prosecutor began her closing argument by telling the jury, "Here are the elements I actually have to prove: I have to prove that the defendant willfully touched any part of a child's body either on the bare skin or through the clothing. . . . [¶] . . . [¶] . . . And I have to prove to you that the defendant committed the act with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of himself or the child." The prosecutor continued, "Take a look at element two: With the intent of arousing, appealing to, or gratifying the lust. . . . Touching does not need to cause the defendant to be physically aroused in any way. Touching does not have to cause the victim to be physically aroused in any way. If you gratify the lust of yourself or the child, it's enough." The prosecutor argued, "Even the defendant's own testimony is that he was touching this child and he continued to touch the child in the middle of the night and he received sexual gratification. The defendant's own testimony is [a] violation[] of Penal Code section 288(a)." The prosecutor summarized, "Very quickly. 'I look but I don't touch.' . . . The problem is that I've read to you his own testimony . . . that he does in fact touch and he does have the intent required for 288(a). [¶] There it is again. Gratifying the lust, passions, and sexual desires. . . . [I]t's really the mental intent of gratifying the lust that we're looking at."

In her closing argument, defense counsel characterized defendant's touching of the boys as innocent hugging and kissing. Counsel stated, "[W]hat is amazing is the prosecution is now arguing that every time he touched [Doe I] that it was in a sexual way, that that itself is a 288(a). How is that possible? [¶] Ask yourself this: If you're attracted to a female and you hug that female, does that mean you committed a lewd act on the female? [¶] Now think about this: —What if someone asked you later—you're attracted to women—'Did you enjoy that hug?' 'Sure.' You might even say, 'Yes.' [¶] But when you're hugging that person, that innocent act, even though you might be attracted to that person, does not rise to the level of a 288(a)."

8

In rebuttal, the prosecutor responded, "Defendant tells you that I'm trying to stand here and say that every act of which he touches a particular individual, particular child, every time he touches [Doe I], it's for a lewd or lascivious behavior. [¶] Well, I've got news for you. I disagree with the defense attorney. When I'm together with somebody that I love, the person who is special in my life, whoever that is, whoever I care for in that moment, and I walk up to them and I hug them, there's lustful gratification that comes from that. And I have no problem admitting that. That's not unusual. That's how we live our day-to-day lives with whoever we choose to spend it with. [¶] The problem is the defendant had a criminal lustful desire."

Contrary to defendant's argument, the prosecutor did not omit the element of intent from her argument. Whether or not there was any overstatement in the prosecutor's assertion that every touching of a person special in one's life is lustful, the thrust of her argument correctly explained that seemingly innocent touching, such as a hug, violates section 288 if done with criminal intent. Defendant admitted "romantic" intent and incidental sexual gratification from touching. The prosecutor asked the jury to make the reasonable inference that defendant touched and hugged Doe 1 to obtain that sexual gratification.

2.    <u>Prosecutorial Misconduct: Evidence of Uncharged Offenses</u>

Defendant contends the prosecutor committed misconduct by repeatedly asking argumentative questions to him on cross-examination that suggested defendant "is a pedophile with a long history of lewd and lascivious touchings of young boys." "A prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact." (*People v. Avila* (2009) 46 Cal.4th 680, 711.) Although the permissible scope of cross-examination is broad (*People v. Letner and Tobin* (2010) 50 Cal.4th 99, 199), argumentative or irrelevant questions may amount to misconduct (*People v. Mayfield* (1997) 14 Cal.4th 668, 755, overruled on different grounds in *People v. Scott* (2015) 61 Cal.4th 363, 390, fn. 2).

9

Here, on the second day of defendant's cross-examination, the prosecutor asked defendant if he gave Doe 4 back rubs and foot massages to "satisf[y] [his] lustful intent?" Defendant replied that, at the time, he had repressed his sexual feelings and did not act "with the intent to satisfy any lustful sexual desires." Before he could finish his answer, the prosecutor interjected, "Mr. Miller, that's not how you answered last Thursday; isn't that true?" Then, she asked defendant about whether he "had the opportunity to speak with your lawyer over the break." The trial court sustained defense counsel's objection. The prosecutor thereafter continued this same line of inquiry, asking, "[I]sn't it true that last Thursday when we talked about you giving back rubs to [Doe 4], you indicated that although you didn't get aroused, it satisfied your lustful intent for [Doe 4]?" Defendant again said that he was not thinking about "sexual lustful feelings at that time." The prosecutor followed up with at least a dozen similar questions, each met with similar answers. In response to defendant's denial that he had previously testified that he "had touched and been in love with four children that [he] got lustful desires off of," the prosecutor stated, "Well, on a break I'm going to ask Madam Reporter to read back what you said on Thursday, so do you want to correct your testimony now?" Defense counsel interrupted with an objection that the question was argumentative and the court sustained the objection. The prosecutor then immediately asked almost the identical question. This time, the court twice overruled defense counsel's objections. Defendant reiterated that the prosecutor was misstating his testimony, and that he had not touched any children to fulfill his lustful desires. The prosecutor replied, "Okay. That's the testimony you'd like to stay with?" The court sustained defense counsel's objection that the question was argumentative. Later, the prosecutor asked, over objection, "Who's victim number 3, the person that you say that you had lustful feelings over and that you touched?" Defendant took issue with the word victim, but said that the only other boy he could think of was Doe 3. The prosecutor immediately followed up: "And that was [Doe 3] when you discussed that on Thursday he would come up and he would touch you and you would have lustful feelings for him, correct?" In response to defendant's statement that he didn't recall that, the prosecutor asked, "We talked about the fact that he would come up and he

10

would be wearing his underwear or he would be half clothed and he would hug you, correct?" Again, defendant responded that he did not recall that testimony and the prosecutor responded, "Do you remember any of your testimony from Thursday?" Again, the court sustained defense counsel's objection that the question was argumentative. Finally, when the prosecutor asked if defendant had singled out the four boys he discussed at trial "because those are four children that you've touched and had lustful feelings for?" the trial court sustained defense counsel's objection finding that the question was argumentative and "asked and answered."

The prosecutor was entitled to cross-examine defendant on his claim that despite being an admitted pedophile, he had never engaged in sexual activity with any boys. Asking him whether he touched the boys to satisfy his sexual pleasure was therefore a proper subject for cross-examination. Contrary to defendant's argument, the questions were not asked solely "to advance a 'prior offense' inference that was not otherwise present in the evidence." The questions were asked to challenge his assertion that he had never engaged in sexual activity with the boys. The prosecutor was also entitled to question defendant regarding any inconsistencies in his testimony. To the extent that some of the prosecutor's questions were argumentative, the court sustained defense counsel's objections, negating the likelihood of prejudice. (*People v. Mayfield*, *supra*, 14 Cal.4th at p. 755, citing *People v. Pinholster* (1992) 1 Cal.4th 865, 943 [generally a party is not prejudiced by a question to which an objection has been sustained].)

3. Prosecutorial Misconduct: Excluded Evidence

Defendant contends his attorney provided ineffective assistance by failing to object to the prosecutor's questions and argument about evidence that the court had ruled inadmissible. "A prosecutor who improperly cross-examines a defendant in order to place inadmissible prejudicial evidence before the jury is guilty of misconduct. [Citations.] Improper questions that violate a previous ruling by the trial court are particularly inexcusable." (*People v. Johnson* (1978) 77 Cal.App.3d 866, 873-874.) Again, however, we find no misconduct and thus, no support for defendant's ineffective assistance claim.

The prosecutor moved in limine to admit evidence about events surrounding defendant's conviction in 1995 for possession of child pornography. The prosecution sought to admit evidence that defendant was arrested in 1994 after he sent pornographic images of Doe 4 in the mail. On the backs of the photos, he had written sexually explicit messages about acts he had performed on the boy, but when questioned by police, defendant "adamantly denied" that he touched Doe 4 inappropriately. Defendant opposed admission of this evidence.

The trial court found that the events involving Doe 4 were remote and that they would lead "the jury to the conclusion, regardless of whether a live victim comes forward to testify to it, that the defendant molested the child." The court excluded the evidence under Evidence Code section 352, but indicated that its ruling was subject to reconsideration if defendant testified. The court explained, "[I]f he were to testify, then as I said, you'd have a different ball of wax. And I'm not asking you to tell me, [defense counsel], whether or not he's intending to testify. But there also may be part of the defense which lends itself through other witnesses to say that he has not molested children. Then that evidence again becomes relevant because you have admissions on the back of the photo that there are certain activities in which he engaged, if you believe those notes. And that would be perfectly appropriate for purposes of impeachment."

After defendant took the stand, the prosecutor asked the court to revisit the issue. Despite some discussion, and for reasons that are not clear in the record, the prosecutor subsequently withdrew her request to introduce evidence of the facts surrounding the 1995 incident with Doe 4.

As defendant notes, however, the prosecutor did cross-examine defendant about his relationship with 13-year-old Doe 4. The prosecutor elicited testimony from defendant that he became close to Doe 4's mother, started to spend nights at the mother's home, and eventually slept in the same room with Doe 4. He stroked the boy's hair and legs and gave him foot massages. He took photographs of the boy. After the boy's mother divorced her husband, defendant continued his relationship with her son and eventually married the boy's mother. As discussed above, when asked if he touched Doe 4 to fulfill

12

his "lustful desires," defendant acknowledged he touched the boy but claimed he did not get sexual pleasure from doing so.

In her closing argument, the prosecutor characterized the Doe 1 and Doe 4 events as "almost twin like" in that defendant had employed the same modus operandi in both instances. The prosecutor argued, "This is the exact reason for that instruction on propensity evidence. It's a mirror image. And the defendant took advantage of both of them, taking images of them sleeping so that he could gratify himself and his lustful desires." The prosecutor pointed the jurors to the instruction on uncharged sex offenses and argued that they could use defendant's uncharged offenses as evidence of the present one.

Contrary to defendant's argument, the prosecution's questions and argument did not rely on the evidence excluded prior to trial. Although the prosecutor asked defendant if he took pictures of Doe 4, neither the content of the pictures nor defendant's sexually explicit statements were referenced. The prosecutor did not question defendant about the details surrounding his prior conviction. Rather, the prosecutor's questions were focused on exposing defendant's modus operandi and the similarity between his approach with Doe 4 and Doe 1. This evidence was not encompassed in the in limine ruling. Because the prosecutor did not violate the court's order, no objection was warranted.

4.      Admission of Evidence: Doe 5's Hearsay Statement

During cross-examination, defendant admitted distributing pornographic videos of Doe 5 over the Internet because he was angry with him. On recross, the prosecutor asked defendant if the reason he had distributed the videos was "because [Doe 5] reported to the police that you molested him." Over a hearsay objection, the trial court allowed defendant to answer. Defendant claimed that Doe 5 had "made a series of bizarre accusations that I and a bunch of other people and a woman and his mother were involved in raping him . . . that were never believed." Defendant testified that he was never charged with any crime relating to the allegations by Doe 5. The prosecutor then repeated her question and asked if defendant was angry with Doe 5 over these allegations. Defendant replied that he was.

13

Defendant contends the court erred in overruling the hearsay objections and to the extent that the statement was properly admitted for a non-hearsay purpose, counsel was ineffective in failing to object on confrontation grounds or under Evidence Code section 352 or to request a limiting instruction.

The parties dispute the admissibility of the statement. The People argue the "allegations by Doe 5 mentioned in the exchange were not offered for the truth, but rather to explain appellant's motive for possessing and posting the video." Defendant argues that his motives for distributing the video were irrelevant, making the evidence inadmissible. We need not resolve this dispute, as any error in admitting the testimony was harmless.

Defendant's explanation given in answer to the prosecutor's question was never challenged. Since defendant admitted to possessing the child pornography, the admission of Doe 5's allegation could not have been prejudicial to his conviction on count 30 (possession of child pornography). Given the overwhelming evidence of defendant's guilt on the remaining counts, it is not reasonably probable the jury would have reached a more favorable verdict as to any of the counts had the testimony been excluded. (*People v. Watson* (1956) 46 Cal.2d 818, 834.)

Defendant's claim that defense counsel was ineffective for failing to request a limiting instruction is similarly unavailing. Without considering whether counsel's performance was deficient, we conclude that any deficiency in this regard was not prejudicial.

5.      Admission of Evidence: Internet Chats Involving Torture Fantasies

During the course of their investigation, officers discovered evidence of defendant's participation in numerous online chats. As discussed above, some of the chats involved defendant's conduct with Doe 1. Other chats, however, involved fantasies about torture and rape. On defendant's motion, the trial court prohibited the prosecutor from presenting evidence of defendant discussing "fantasy" chats about engaging in rape and torture in her case-in-chief. The trial court characterized these conversations as

14

"horrific" and "extremely inflammatory," and found that if the jury heard them "all bets would be off immediately."

Prior to defendant's testimony, defense counsel sought a ruling on whether defendant would be subject to cross-examination concerning the "fantasy" chats. The court did not rule, stating, "It's my inclination to keep the torture chat logs out just by virtue of their inflammatory nature. However, if he opens the door to them, then I will consider letting some in." The court clarified that if defendant testified that his chats involving Doe 1 were also fantasy, the prosecutor would be permitted on cross-examination to contrast the language used in his chats about Doe 1 with the language used in the other chats: he expressly used the word fantasy in the latter chats but not in those involving Doe 1.

In his direct testimony, defendant testified that he wrote the chats recovered from his computer but did not engage in the sexual activity he described. During cross-examination, the prosecutor asked defendant about online chats in which he spoke of performing sex acts on young boys. Defendant testified that he had made many such claims over the Internet, but that any statements "about literally having sex with a child is an invention that I say to other pedophiles on line." He explained that he did this to brag and to excite himself, because it was the only way that he could satisfy his sexual desires.

Outside the jury's presence, the prosecutor renewed her request to bring in the torture chats. The court observed that by characterizing his online boasts as inventions defendant had placed the torture chats at issue. The court ruled that the chat logs would be sanitized, allowing the prosecutor to cross-examine defendant about the fantasy chats without quoting from the chat logs. The court ruled, "I'm allowing [the prosecutor] to ask three separate questions about the essence of what the chats are. She's not going to be reading from the chats unless he denies it. If he denies that he said those things, then you have issues, [defense counsel], with the actual chat coming in."

When cross-examination continued, defendant admitted there were other chat logs in which he talked about "rape and torture and murder" and also about "boy bondage." The prosecutor asked, "[Y]ou're . . . talking about the particulars of what you would like

15

to do in your sexual fantasies?" Defendant responded, "Yes." The prosecutor then asked, "In those particular chat logs, you're very clear with the other pedophiles that you're chatting with that it is fantasy you're talking about; isn't that true.?" Defendant agreed, "That's right." Thereafter, defendant agreed that in the chat logs in which he discussed his sexual relationship with Doe 1, he did not suggest that it was a fantasy. Defendant also acknowledged that in the "child bondage rape logs" he told the other pedophiles that "when they want it for fantasy, [he] want[s] it for real?" Defendant explained that he did not mean what he said. Rather, "It's all part of the playing—it's all part of the game in order for me to get off. Of course I don't want that."

In closing argument, the prosecutor argued "defendant clearly can distinguish between fantasy [and] reality. . . . [¶] . . . [¶] . . . We talked about the bondage, rape, and whatever chat log. And the defendant even says—he admits in those logs to the other pedophiles he says, No, it's fantasy. And writes that in the logs themselves. [¶] Take a look in the logs that you actually read [relating to Doe 1 chats]. Not once does he say, 'It's fantasy. I'm making this up.' Not once does he say, 'This is what I want to do to [Doe 1].' He says, This is what I am doing to [Doe 1]."

Defendant argues the court abused its discretion under Evidence Code section 352 by permitting the prosecutor to cross-examine him regarding "fantasy" chats in which he discussed torture. We disagree.

The evidence was relevant and probative of whether defendant's claims about his conduct with Doe 1were real or fantasy. While the evidence was potentially prejudicial, the court took reasonable steps to sanitize the evidence and limit the jury's access to the inflammatory content. We cannot say that the court abused its discretion in finding that the probative value of the evidence was not outweighed by its prejudicial effect. [3]

---

[3] Defendant also argues the prosecutor improperly reinforced defendant's "fixation on child torture by inadvertently passing out a chat transcript without redacting the line, 'you like boy torture stories!' " Defendant acknowledges that the error was corrected and the reference to torture deleted as soon as defense counsel objected, but argues that "many of the jurors had already begun reading the exhibit by that time." Defendant's argument that "many of the jurors had already begun reading the exhibit" by the time the error was

6.    Restitution Fine

Defendant was ordered to pay $1 million in restitution to Doe 1 under section 1202.4, subdivision (f)(3)(F), which authorizes a trial court in a criminal case to impose direct victim restitution for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288." Defendant contends the order violated his Sixth Amendment right to jury trial and Fourteenth Amendment due process rights. We disagree.

In *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." More recently, in *Southern Union Co. v. United States* (2012) __ U.S. __ [132 S.Ct. 2344, 2357], the United States Supreme Court held that *Apprendi* applies to the imposition of criminal fines. As the court explained: "*Apprendi's* 'core concern' is to reserve to the jury 'the determination of facts that warrant punishment for a specific statutory offense.' [Citation.] That concern applies whether the sentence is a criminal fine or imprisonment or death. Criminal fines, like these other forms of punishment, are penalties inflicted by the sovereign for the commission of offenses." (*Southern Union Co*., p. 2351.) Relying on these cases, defendant contends that the restitution order in this case is a criminal fine that exceeds the statutory maximum, so that he was entitled to a jury trial and a verdict based on proof beyond a reasonable doubt.

---

discovered is purely speculative. While it is unclear exactly how long the jury had the unredacted transcript in its possession, the chat log had only just been admitted into evidence and as soon as the objection was made the court advised the jury not to read the transcript. The transcript was replaced with the redacted copy while the jurors were at lunch and, upon their return, they were directed to read the redacted transcript. Even assuming that some jurors had read the unredacted version, given the admissible evidence discussed above, defendant surely was not prejudiced by the additional reference to torture stories. For the same reason, defendant was not denied effective assistance of counsel by his attorney's failure to seek redaction earlier.

Defendant acknowledges that restitution orders for economic loss are not considered punishment for Sixth and Fourteenth Amendment purposes and thus do not fall within the scope of *Apprendi.* (*People v. Harvest* (2000) 84 Cal.App.4th 641, 648 ["Although restitution has an element of deterrence [citation], the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime"].) He argues that restitution for noneconomic loss is distinguishable and should be considered punishment. Defendant acknowledges that this argument was rejected in *People v. Smith* (2011) 198 Cal.App.4th 415, 433, but contends that case was wrongly decided.

In *Smith*, the court held that "a restitution order for noneconomic damages does not give rise to a jury trial right." The defendant argued that "because noneconomic damages are determined pursuant to a subjective standard, that determination must be made by a jury."[4] (*People v. Smith, supra,* 198 Cal.App.4th at p. 433.) The court rejected this argument, explaining that "there is no basis for distinguishing jury trial rights, or lack thereof, for restitution orders for economic damages and restitution orders for noneconomic damages. In both cases, the trial court is performing a task that, in a civil case, a jury would perform." (*Ibid.*)

Defendant asserts that this reasoning in incorrect because the subjective nature of the calculation demonstrates that the primary purpose of a restitution order for noneconomic loss is punitive and not merely to compensate the aggrieved victim for his or her losses.[5] He argues that "unlike direct economic restitution, the amount of

---

[4] Unlike economic damages, which are concerned with "objectively verifiable monetary losses" (Civ. Code, § 1431.2, subd. (b)(1)), noneconomic damages relate to "subjective, nonmonetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).)

[5] Defendant also argues that the punitive purpose of noneconomic restitution is demonstrated by the fact that "the subdivision applies only to defendants convicted of section 288." But all restitution orders under section 1202.4, whether economic or noneconomic, require a criminal conviction. Therefore, economic and noneconomic restitution cannot be distinguished on this ground.

noneconomic restitution will necessarily turn on such factors as the duration or severity of the underlying crime" and that "there is literally no limit to the amount of restitution which may be imposed for noneconomic losses . . . so long as the amount does not " 'shock the conscience or suggest passion, prejudice, or corruption on the part of the trial court.' " Whereas, "[b]y contrast, direct economic restitution contains a built-in proportionality limitation, since it must be based on actual, demonstrated loss." We disagree.

The subjective nature of the calculation does not render the order punitive. The purpose remains compensation for the victim's loss, not punishment of the defendant. (*People v. Pangan* (2013) 213 Cal.App.4th 574, 585 [Direct victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits].) There is no principled basis for concluding that a victim of child molestation should be required to pursue a separate civil remedy to recover for his or her psychological injuries when victims of other crimes are entitled to restitution for their losses. The complexity of the calculation of the value of the victim's non-economic injury does not make the order punishment. Restitution hearings for economic loss often involve the presentation of additional evidence and complicated calculations. (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1175 ["courts are often confronted with restitution situations that require 'complicated calculations' "], citing *People v. Giordano* (2007) 42 Cal.4th 644, 661 [calculation of surviving spouse's loss of support is not unlike other enumerated categories of loss that "may require complicated calculations or result in large restitution awards."]; *People v. Baumann* (1985) 176 Cal.App.3d 67, 74 ["lengthy hearing to determine extent of loss attributable to defendant's embezzlement, taking evidence from several witnesses and receiving 75 checks into evidence"].) Defendant was not entitled to a jury trial on the amount of victim restitution pursuant to section 1202.4.

Contrary to defendant's argument, the restitution order was not excessive. Citing *People v. Carbajal* (1995) 10 Cal.4th 1114, 1125, defendant contends the restitution order must be reversed because it is an abuse of discretion to order restitution based

solely on "the trial court's subjective belief regarding the appropriate compensation," with no "factual and rational basis for the amount ordered." (See also *People v. Giordano*, *supra,* 42 Cal.4th at pp. 664-665 ["[W]hile a trial court has broad discretion to choose a method for calculating the amount of restitution, it must employ a method that is rationally designed to determine the surviving victim's economic loss."].)

In *People v. Smith*, *supra*, 198 Cal.App.4th at page 436, the court held that the standard of review applicable to economic restitution orders, as set forth above, is not applicable to an order for noneconomic loss. The court explained that "[u]nlike restitution for economic loss, . . . loss for noneconomic loss is subjectively quantified." (*Ibid.*) The court concluded that trial courts should be guided by the jury instructions applicable in a civil action seeking noneconomic damages and that appellate courts should apply the corresponding standard of review. Under this standard of review, the appellate court will intervene only if the restitution order is so large that it "shocks the conscience and suggests passion, prejudice or corruption." (*Ibid*.)

In this case, the prosecutor urged the court to impose a $1 million fine under section 1202.4, subdivision (f)(3)(F). The prosecutor argued that such an order was appropriate because of the serious psychological damage inflicted by defendant and that the order was in line with other restitution orders issued in similar cases.[6] The prosecutor also relied heavily on *People v. Smith, supra*, 198 Cal.App.4th 415, in which the court

---

[6] In her sentencing memoranda, the prosecutor cited the following Contra Costa County Superior Court cases in which similarly sized restitution orders for noneconomic loss had been entered and attached those orders as exhibits: *People v. Dela Calzada* (2011, No. 5-100469-6) and *People v. Barriere* (2011, No. 5-070288-6). On appeal, defendant requests that this court take judicial notice of the unpublished appellate decisions in those cases so that he may distinguish them factually from his case. As defendant notes, the restitution orders attached as exhibits to the prosecutor's sentencing memorandum were fairly devoid of facts and were offered only to demonstrate that a million dollar restitution award being requested would not be out of step with other recent cases. Because the additional facts defendant seeks to cite were not before the trial court at the time the order was made, those facts are not relevant to our determination of whether the court abused its discretion in calculating the amount of the award. Accordingly, we deny defendant's request for judicial notice.

upheld a restitution order calculated at $50,000 for each year the victim was molested. The prosecutor argued the $1 million requested was less than $50,000 for each count on which defendant was convicted. The trial court agreed that $1 million was warranted based on Doe 1's psychological harm. The court explained that he had observed Doe 1 in a video shown during the trial and that he was "a child who was full of life and happiness and fun" but that "what we saw when that child testified was a hollow shell, devoid of personality and robbed of all vitality. The juxtaposition between the video and the real person who came here was shocking and heartbreaking. [¶] You took away every ounce of joy from that child and left behind a shattered soul who was led to believe that the molestation was all his fault because he never protested, when, in reality, you are the one who stepped into his life, assumed his father figure role, gained his trust, and then proceeded to violate that trust in every conceivable way." Contrary to defendant's argument, the trial court's observations regarding the victim's demeanor amply support a finding that he suffered significant emotional distress as a result of defendant's criminal conduct. Accordingly, we find no abuse of discretion in the court's restitution order.

## Disposition

The judgment is affirmed.

_____
Pollak, J.

We concur:


_____
McGuiness, P. J.


_____
Siggins, J.

A139503